As the court knows, the Gibbs case involves two issues involving what constitutes intolerable working conditions under Oregon Wrongful Constructive Discharge Law, as well as the issue as to whether this particular wrongful constructive discharge is preempted under ORS 654062. The lower court really didn't analyze the preemption question, relied on Walsh and cited an unpublished district court opinion, Blevins, and simply held that the presence of those adequate remedies was sufficient to preempt the case, and then in the alternative went on to analyze whether there was intolerable working conditions present or absent. And I think that's the evidence of it in this case. On the 654 preemption issue, this case is the situation where there is no complaint about safety. It's simply clearly, repeatedly, this is illegal activity, what you're proposing, the use of unlicensed technicians in Oregon, and I won't be a part of it. That's paraphrased. But this case isn't being brought under the whistleblowing statute as such. Correct. There is no 650. Is there a reason? I'm sure there is. And this one seems much more like it than the other one. Well, that may be. Nevertheless, there is no 659-550 whistleblowing case, claim in this case. And as I said, it really is a situation where it's repeatedly complaints about this is identifying conduct as illegal. It's illegal not under any safety statute but under the environmental laws regulating pesticides and the application of pesticides. And there is no discussion as to workplace safety, the safety of the technicians applying the pesticide, or my client's safety in the workplace. So the court simply jumped the gun and went to Walsh, went to Blevins, and said it's preempted. Yeah. What is the nature of the licensing requirements for pesticide applicators? Are these financial requirements? Is there bonding? What is it? I'm not familiar as to whether there's bonding or not. There is an application process that requires filling out certain forms. It's not very well developed in the record. And part of the issue in this case is what is required at what time? Because during the period in question, it may have changed, and the record isn't clear when that change took place. Part of the defendant's argument is that all you have to do is apply for the reciprocal recognition. And once you apply, that's enough. And our position is that that change didn't take place until later. You actually had to get the license at the time in question. But it does seem to be a minimal requirement. Nonetheless, it is a requirement. Precisely. It may not be a significant requirement in terms of safety. It may not be a significant requirement in terms of accomplishing the goals of the act. But nevertheless, it isn't. And at least it shows that people who are doing this work in Oregon were licensed somewhere else. Precisely. And therefore have been trained somewhere else and received the ‑‑ So it's technical in nature. But nevertheless, the absence of it does subject one to penalties. And in fact, the company was subjected to penalties numerous times in 1999, the time in question. And that's in the record. So this is the case where if there is no discussion of workplace safety, it's not preempted. So we get to what I believe is really the core issue in this case, and that is under Oregon wrongful constructive discharge law, what is the standard of intolerable working conditions? And I think one of the key factors is that not only is it totality of the circumstances that must be used to determine that, but it's whether a reasonable person in the employee's position would feel compelled to resign. So there is the quality of it that you have to look at the individual plaintiff in his particular position. And that is why in this case, the conduct prior to January 1999, when he makes the opposition to the illegal activity in that conference call in January, prior to that, there is some retaliation based on some prior complaints. And the court erred in not considering that, ruling that it was irrelevant. And the error, the reason that's error is that if you don't consider that, you're making two errors. One, you're not putting, you're not considering the individual in the employee's position, in Mr. Gibbs' position. You're also not considering the cumulative effect. You can't, the court, nor do we argue that liability can be imposed for that conduct. But it certainly contributes to whether there's intolerable working conditions. And what was intolerable about the working conditions? Well, it stems, it starts with, and it's critical that we do not isolate the individual aspects, the pattern of conduct that starts in January. It starts with the intense conference call in which he is adamant, he being then Hubelis, and I'm probably mispronouncing that, is adamant that we're going to do this. We're going to get this done. And it doesn't, essentially, it doesn't matter if it's unlawful. One of the things that isn't as obvious in the written briefing is this aspect of we're willing to pay the penalties. And that is repeated in the next call and is repeated later from Levitt. And that willingness to pay the penalty is a statement by the defendant of we don't care that you're telling us it's unlawful. We're willing to do it. But why is that intolerable to him? Well, he's, it's his license, for one thing. It's his license for the Portland branch that's in jeopardy. There are. What was that? Just, if you could spin that out a little bit. He has an individual license, no? I'm sorry? He has an individual license, does he not? Right. So why is it his license that's at stake? The nature of the laws prohibiting the employment of unlicensed technicians, those laws include penalties. So a licensed person hiring an unlicensed person. Right, precisely. Interesting. And so in the, it starts with the January call. They're adamant, we'll pay the penalties. And immediately afterwards, he tells other people in the meeting, I'm going to get his job. He's not going to last long. And it's critical that we start with that recognition, that from the get-go, Van Herbelis is out to get Gibbs due to his resistance to that illegal activity. Because that then influences the, how the court looks at and how a jury would look at the behavior that follows that January conference call. Are you arguing that any time that somebody is asked to do something illegal, that's an intolerable working condition? Not necessarily. Any time that they. I don't need to make that argument in this case, because he's asked to do it repeatedly. Every time anybody is repeatedly asked to do something illegal. And he suffers adverse consequences because of it. They set out to undermine his authority. They talk to employees behind his back. He's setting out when he's trying to implement Orkin policies. Van Herbelis tells him, oh, I don't, I don't agree with those policies. He Herbalis is his boss. Yes, absolutely. The policies seem to be decided by the boss. Well, there are a lot of times the employee doesn't agree with what they're decided by the company. And so it isn't a jury question. Is he. Is it Herbalis is simply saying he's got it wrong. These aren't the way the policy should be done. Or is it my client's perspective that he's undermining my authority. The company says this is the way it's to be done. And he's going around backstabbing me when I try to do what the company tells me to do. I mean, you can't make intolerable working conditions out of backstabbing, disagreement about policies. Not alone. Criticizing people behind their back because we'd have everybody and their brother being constructively discharged. These things happen in workplaces every day. So ultimately, ultimately, it seems to me that you're going to have to stand and fall on matters related to the illegal activities. I agree. I agree. But our position is that the stabbing in the back, undermining his position, making it more difficult to perform his job, is related to the illegal activity, that it is retaliatory in nature. But you're right. We're not relying simply on he goes behind his back and causes difficulty. There is the meeting in March, the Get Sam, I'm sorry, in April, the Get Sam meeting, where it's a manager's meeting and it turns into a hostile, focused criticism of my client in front of other managers. What's wrong with that? Well, there's evidence that he's performing well at the time. His meeting budget, his projections are up. Levitt testifies to that. But immediately after that meeting, Levitt goes ahead and makes suggestions that, well, doesn't make suggestions. He inquires, do you want to quit or be fired? So, again, there's an immediate link to the hostile retaliatory conduct and the animus, or the hostile conduct and the retaliatory animus to get rid of my client. Before that April meeting, well, I'm jumping around. I'd better finish the April meeting. After that April meeting, a day or two after, there is the appraisal, the performance appraisal, where he's criticized. It's a coaching and counseling report. His job is actually threatened at the bottom of it, right? Precisely. Do you want to quit or be fired? And then followed by, I'd like a letter of resignation. That was later. But this form has something at the bottom about reevaluating his employment status or something like that. I'm sorry, which do? The counseling form, or whatever it was called. Right. The counseling form contains negative comments about him being below standard, his attitude being a problem. There's the prior evaluation where he's criticized for being impenetrable and rigid. Earlier in March, he has needs improvement ratings. And it's not just any one of these things. It's the pattern that starts in January. When he reports the complaints after January to HR and the hotline, what happens? They have an investigation where Levitt conducts the investigation himself of the conduct he's alleged to have engaged in. My client reports Levitt. I am told Levitt says we'll pay the penalties. He reports that to HR. He reports it to the hotline. And who investigates whether that's done or not? Levitt. My client sees that as retaliatory. I'm making these reports. I'm resisting this. And the company is doing nothing to take it seriously or do anything about it. Where is the counseling form directly? Where is the which form? Counseling form. Casting form? Counseling. I'm sorry. I'm being told it's SER 181. Okay. Thanks. It's also in the file. All right. Go ahead. Thank you. But, again, it's the pattern. There's the investigation in February after the reports. There's the March performance review. And, again, in that performance review, the nature of the criticism reflects a retaliatory animus. He's criticized for his handling of internal customers. He's criticized for his rigid style not being penetrable. And he's criticized for needing improvement in corroboration. There's the Get Sam meeting in April, which is followed by Quit or Be Hired. And then, ultimately, he goes after that meeting, Quit or Be Fired, followed by the counseling form, which talks about his attitude and the problem with his attitude. He goes on that week off. Levitt says, I want you to work with Van Herbelis for a week, and then I want you to take a week off. A week off that my client wasn't intending to take, didn't want to take at that time. He uses his suspension when he's being told he has to accomplish other things by June 1st. Was he paid for that week off? I believe he was. Yeah. But during that week off, and this goes to your idea that doesn't he have to rely upon the link to the illegal conduct and his treatment because of that? During his week off in April, he finds that they are making illegal applications. And he takes those invoices to Levitt. And he goes to Levitt and says, look, here it's being done. Here it is illegal. I can't work under these conditions. My license is at stake. It's illegal conduct. And Levitt's response is, oh, it's not that serious, and here's the critical language you need to bend. And at that time he does ask for the letter of resignation and proceeds to fill out the paperwork that he's resigned. Okay. Did at some point you seem to be arguing that he did actually really resign, at least at that point? Well, you know, this is an awkward constructive discharge because he says I can't work under these conditions. And they say, well, they're not going to change. You've got to learn to bend. Give me a letter of resignation and fills out the paperwork that he's resigned April 30th, even though he hasn't resigned. He goes to upper management, explains the situation. Upper management, not knowing about the paperwork having been filled out by Levitt, says, well, consider yourself still employed. Does a sham investigation. Says, oh, there's no problem, no corroboration. So I guess at that point he's resigned. But it's it's it's a little different than some situations. There's not a formal resignation in that regard. I will save the remainder of my time for rebuttal. Thank you. May it please the court. I'm Corbett Gordon representing Peli Orkin Exterminating Company, Incorporated. Orkin withdraws its request that the court apply either the clear error or the prejudicial error standards to the opinion below. We are arguing only de novo review and which actually made your brief very difficult because you weren't focusing on a summary judgment standard. And it made it very difficult to sort through the fact as a result. I apologize. Addressing the use of the abuse of discretion standard, which I think is appropriate for the exact issue that Mr. Hunt was discussing a moment ago. We think that is appropriate for Judge Ashman's limitation of this case to the January 22nd report as being the first report that Mr. Why is that abuse of discretion? No, I'm saying the use of discretion standard. Why is it abuse of discretion standard? To eliminate things that couldn't possibly be causation under the claim at hand. The claim at hand is wrongful discharge. Well, but there's an underlying legal question as to whether they're relevant to whether one is legally discharged. Then you'd have a causation question after that. At least there's a legal question as to whether that's true or not. It may not be true, but it's a legal question. Okay. Well, if the court is going to call it a legal question and the court will use de novo review, I think it's an evidentiary ruling. While Judge Ashman's case did not lay out evidence rules 401 and 402, I think he must have had them in mind as he does talk about relevancy. And that these acts, whatever occurred to Mr. Gibbs before his demotion, the reorganization of the company, how that fell to him, how he was disappointed, how he felt it was demeaning to him, all of that happened before he made the reported issue here, and therefore is irrelevant to this consideration in our opinion of the way a court should look at these facts. Addressing the preemption issue, Walsh is alive, we believe. It is cited at great length and quoted at great length in Holeen, which is the opinion that sets out the standards we were discussing in the prior counsel in the ransom case. The cases are factually – Well, can you help me a little bit then on what the purpose of this licensing is? What are the amounts to? Well, under the licensure standard, the licensing, I believe, is to ensure that people applying pesticides are tried and safe, which would affect both their own health, the health, i.e., of the worker involved, and the health of the public whose house or commercial premises is being terminated. Well, I mean, what are the requirements? Do we have to take a test? It is, as Mr. Hunt explained, as far as I understand the record as well, and that is that it's a requirement that you have a license. Having a license from another state is simply a matter of paying some money and getting reciprocity. There's a lot of talk in this case of unlicensed texts. In fact, they were licensed in Washington. There were no unlicensed texts. It's simply they weren't licensed in Oregon. The requirement is to ensure that people, I believe, have been trained and can safely apply the pesticides, and to protect, therefore, the workers on site and anybody else who happens to be in that premises, whether it's a home or a commercial place. So we would cross the line, just as it did in the Blevins case, between public and private interest. The difference here between this case and Blevins is that counsel for Mr. Gibbs conceded the public interest wrong in oral argument at summary judgment, and that's at SER 195. When the court was questioning counsel and the counsel responded, he, with reference to Mr. Gibbs, was not informing his employer that the violations of the law constituted a public health hazard, thereby removing the public health part of this and the public policy part of this from the case, leaving us with a case directly under the or OSHA standard of protecting the worker in the workplace. I understand. What I meant to be saying was that he was protesting the fact that he was being asked to do something illegal, because it was illegal and it would threaten his own license, and he had his own workplace interest in doing that, but they were not OSHA interests. I understand Mr. Hunt to be arguing that. And I also understand counsel from his office to have conceded the public health hazard issue. But that's a slightly different question, isn't it? I don't think so, not in terms of the preemption issue. And, in fact, it may take this out of the public policy pocket altogether. There may simply be no opportunity. Isn't that an interest in following the laws just because of the laws? Excuse me? Isn't that an interest in following the laws because they're the laws and not getting yourself unlicensed or unable to do your profession because you've done something illegal? That would be, I believe, a creation of a new cause of action. And the tort of wrongful discharge is supposed to be narrowly construed. I thought there was a category of cases that specifically dealt with workplace interests. But this workplace interest isn't necessarily an interest in safety. It's an interest in keeping his job by not getting unlicensed. That was his subjective purported interest was, I'm worried I will lose my license, and I am worried that you are doing something illegal and that that will cause me to have trouble. Right. But under the OSHA standard, anything that touches the safety of workers in the workplace is covered by that statute. So it's not so limited. It doesn't have to be, then, in the worker's mind, just as there's no evidence, I believe, in the Blevins case. In Mr. Blevins' mind, that he was protecting the greater public or he was protecting his own interests or he was protecting the other employees. You look at what's laid out and what it will have and the OSHA standard then would apply. And I think prior counsel, arguing counsel in the ransom case, talked about a crossover with the Butler case, which I found quite interesting. I guess I'm still kind of hung up on what the license is for. I'm very familiar with contractor licensing statutes, which are far more than just making sure that there's safety on the job. They have to do with knowledge of the particular trade and financial responsibility and there's bonding and all kinds of things. So can you help me with what there is in the record about what these requirements are generally? The OSHA statute is in our addendum, as is the federal statute on which Walsh relied, which we also argued to the court. And let me see if I can put my finger on it. I think I saw some of the – I think it was the OAR's on licensure. I believe they are in the record, but I can't put my finger on it right now. Okay, well, I – That's not the licensing statute. Nothing in the record that goes to the actual licensure issues that you're inquiring about. I'm sorry. Looking at Mr. Hunt's concern about the Oregon statute or the Oregon case law versus federal case law. Excuse me. Is there a list of people that you can call? Can the public call and find out whether the person who is at his house is licensed? I don't know. In fact, people are – the technicians are going to people's houses. They're putting pesticides down. They're then leaving, and the pesticides are staying there, which certainly suggests that the major concern is with regard to the effect on the people who are remaining in the house. Are there people who are going to be exposed to the pesticide for a much longer period of time than a guy who's there for a short time and presumably has the ability to protect himself while he's working there? It just seems common sense that the point of this statute is not especially to deal with the people who are applying the pesticides. I'm not going to concede that point because I think that implicit in the statute is the safety of the worker himself or herself, just as it was with the DOT regulations in Blevins. Well, one thing that would help us to know what the licensing requirements are. Do they deal with questions like whether the worker wears masks or protective clothing and so on, or is that all an ocean? I can't answer that question. I don't think it's in our record. Moving to the intolerable nature of the argument about the intolerable nature of what happened with Mr. Gibbons, I would suggest to the Court that almost everything about which Mr. Gibbons complained is something over which he had control himself. He took that job in September. He was down three texts. He was offered help in January by his boss to send him some texts. What does the record show? I found it quite confusing about whether Mr. Gibbons had the authority to hire people. I can't point you to a specific place in the record. Well, Mr. Levitt said he did not specifically. Did anybody say he did? I thought he did. Is there anything? I could not find anything in the record except some assumptions that said that he had the authority to hire anybody. And Mr. Levitt said definitively that he did not. Well, he was criticized, certainly, for the turnover at his branch. Well, that's people leaving, but what about filling in? Did he have the authority to go out and hire people? I thought he did. Okay, well, it would be nice to know. I couldn't find it. No, it would be. In McGanty, McGanty itself stands on facts where there was a 19-and-a-half-month continuous pattern of sexual harassment of the plaintiff. That was implicit in the record. It was acknowledged expressly in the opinion by Judge Graber. I guess she was then Justice Graber. And it was also acknowledged by her that this was deemed wrongful by both parties in that case. So to the extent that the Oregon case law then at that point didn't go into fleshing out these aggravated circumstances or totality of the record test or whatever test would be used, but instead it has developed through adaptation of federal law by the judges, I think is not inappropriate. I would disagree with Mr. Hunt on that point. And I don't think that the end result is any different under the test applied under Thomas by Judge Ashmansis in this case. Let's suppose everything Mr. Gibbs says is correct. Or let's even spit it out and make it more egregious. Suppose this went on for a year, and there was no dispute that he was being asked to use unlicensed people, and it was clear on the record, as I'm not sure it is clear, that there was no way to move people around to have them doing things legally. And, in fact, his own license was at stake. Would you consider that to be intolerable conditions? I can't answer that question because your assumptions of what Mr. Gibbs is representing is not what the record is. I'm exaggerating somewhat what he's representing. I'm asking you if my hypothetical was correct, would that be intolerable conditions? I don't know. It might be. I'm not sure it would be because I have trouble divorcing myself from the facts of this case where it was my belief that Mr. Gibbs was being sent people to do the work. He was able to rearrange it in January. He got his Washington people, licensed people, up doing the Washington work. He got his Oregon people down doing the Oregon work. He said that was true in January. He said it wasn't true after that. And we know for sure that in April, the week he was away, apparently using his license, unless you can explain to me why that's wrong, there were people who worked unlicensed and were cited for doing so. Right? There were people in April who were not licensed in Oregon. Right. And the record shows that their licenses had been applied for. Right. But it was illegal for them to do what they did. Technically, yes. Okay. And it did happen while he was gone. It did not happen during January. And in the record is a record. But that's certainly some confirmation that the people who were running the place were asking him to do it because when he wasn't there, they did it once he was out of the way. Well, he also admits that he did it a couple of months. Right, but under protest. I think if he wanted to have a wrongful discharge, he should have said, I'm not going to do this, I quit. That's what he eventually did, exactly. Exactly that. Well, he didn't do it the first time he was asked, or the second time, the third time, the fourth time. He continued his employment. And he was trying to work it out. And also, again, there was some ambiguity as to the illegality at that earlier juncture, which was washed out over time. He got positive performance appraisals. He got offers of help from other offices. He got a counseling and coaching form that offered him, let's get your office stabilized, which I think. The method of stabilizing seemed to be to have people work illegally. I think, I beg to differ, I think the record means that he got a full complement of workers hired and have them go out and do. Well, I really would like you to show me in the record where it says that he had the authority to hire anybody. Because I found the opposite. I found Mr. Leavitt saying definitively that he did not. We're looking. Okay, so I think that the McGinty, the prong, the second prong of McGinty on intelligence conditions is really no different than the argument that we come to under federal law. Going to plaintiff's concession that there is no public health hazard here, I think takes plaintiff directly out. I think that ends our case. I think at that point we have no public policy, articulate public policy in the state of Oregon on which plaintiff is relying. I think it was admitted away by counsel at summary judgment. And then looking at the facts as most favorable to Mr. Gibbs and working through what happened to him, the very man who says, who is claimed to have said, or we have to take as true as saying, I will get his job gave him a favorable performance appraisal. This whole conference during the meeting that he describes as Get Sam is also a meeting that he alternately describes on the record, in the record, as being a common type of meeting that was held with different managers where they focused on one officer, one manager at a time, and tried to give This is the problem. We're here at summary judgment now, okay? And we have to be looking at the record most favorably to Mr. Gibbs. And your brief didn't address that, as I said previously. And this sort of discussion isn't doing it either. Really what you need to do is address the record as most favorable to Mr. Gibbs and tell us why that doesn't establish something that the jury could find properly was a retaliatory district. I think in many ways that's true because he had the power, I believe, and we're looking in the record for that, to have corrected the problem about which he was complaining. He got a favorable performance appraisal. You don't give a favorable performance appraisal to somebody you're trying to force out of a job. Okay. But he says that he was told that he had to use these unlicensed people. And he says that although at some point early on, he says he's not sure he was able to move people around because the company disfavored that. But certainly at some point we know that it wasn't possible to move them around. They weren't moved around because, in fact, they did work illegally when he wasn't there. And he says that he was told that he had to quit or get fired. And he says, and the counseling form says essentially in it that he had to quit and get fired because the last sentence is that one of the remedies is for him and the company to reevaluate his employment relationship, which to me says quit or get fired. So why isn't that enough to get by summary judgment? Because he was getting a message, a clear message, also up to the very last letter from Vice President Rowell on the 30th of April, encouraging him to get back and talk to him about putting his job back together, getting his branch up and running. Based on your complaints, I'm agreeing to do so. We'll begin manager and employee interviews immediately. Right to the very end. Well, I don't know which way that cuts. Well, he was trying to get Mr. Gibbs to come back and talk to him about staying in the job. And then eventually he decided that nothing had gone wrong and that he should go move to Atlanta and do some other job. He previously said he would. Maybe, which may not even exist. He would look into it, he said. He would look into it. Okay. Well, you've just about used your time. Have you found the site yet? No, not yet. I'm sorry. Well, are there any further questions? Thank you. You have a couple of minutes. If you find the site for us before we order the case, let us know. You may close. Thank you, Your Honor. There was no concession at oral argument, at summary judgment, that this was outside of any public policy. The public policy is to, that my client was objecting to, was being told by his employer he had to do something illegal, pointing it out to his employer it's illegal, telling him he wouldn't do it, and being told you have to do it, we'll pay the penalties, you need to learn to bend, and do it. There was no concession of that nature. Well, for the purpose of protecting, my understanding was opposing counsel said that there was a concession at the hearing, that it was not to protect the public. Is that correct? I believe that's a misinterpretation of the concession. I believe Judge Berzon stated it correctly as to what was being said at oral argument. The statement is he's objecting to illegal activity. That's what the argument was. And he didn't make statements about public health. He didn't make statements about workplace health. He didn't make statements about health. But that doesn't mean that the policy underlying the environmental statements doesn't support a wrongful discharge or the environmental protection laws in question. I need to correct one thing, and that is that I don't believe there's anything in the record where my client admits that he engaged in the illegal activity. There is evidence that in the months prior to April, well, first of all, the evidence was in January, he could rearrange things. Even though he hadn't been suggested to do it, he could rearrange things so it wasn't illegal in January. Then there's evidence that in the later months, February and March, people working under him or Mr. Herbalist would send people out unlicensed when my client was down in Salem trying to get the reciprocal licenses. So he'd go off and try to accommodate what they were proposing to get the work done, and the illegal activity would be engaged in. And then there is a clear evidence of the illegal activity when he's off work in April, as evidenced by the invoices that he presents to Mr. Levin. So I don't believe he admits to engaging in the illegal activity. It's that that he refuses to engage in and is told he must that constitutes the intolerable working conditions when combined with all the other conduct he was subjected to. Thank you.
judges: Schroeder, Hug, Berzon